No. 19-0143, *State of West Virginia v. Harry Lee Smith, Jr.*,

**ARMSTEAD, C.J., concurring in part and
dissenting in part, joined by JENKINS, Justice:**

**FILED**
**June 16, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

I concur with the majority's decision insofar as it upholds Mr. Smith's convictions for three counts of wanton endangerment and one count of breaking and entering. However, I dissent as to the majority's decision to vacate the convictions for two counts of kidnapping.

The definition of kidnapping in our state has clearly included *either* transportation *or* restraint with the intent to carry out certain harmful acts. The Legislature has modified the kidnapping statute at various times, but I do not read the statute to require transportation of the victim in order for the crime of kidnapping to be committed when the victim is restrained with the intent to terrorize such victim. Because I firmly believe the Legislature intended kidnapping to include the unlawful restraint of a person with the intent to terrorize that person or another – as took place here – I dissent, in part, from the majority's opinion.[1]

The horrendous facts of this case clearly fit within the clear statutory definition of kidnapping.

---

[1] Although I dissent as to the decision to vacate the kidnapping convictions on the grounds cited by the majority, I acknowledge that the circuit court erred by assigning the determination of whether there were mitigating factors to the jury. *See State v. Scruggs*, 242 W. Va. 499, 836 S.E.2d 466 (2019).

1

On December 4, 2017, the Petitioner broke into the home of his former girlfriend, A.R., while she was sleeping. At the time of the break-in, A.R.'s two children, D.R.-1 and D.R.-2, were living with her. D.R.-1 was studying for her nursing exams in her bedroom when she looked up and saw the Petitioner with a gun pointed toward her head. The Petitioner ordered D.R.-1 to get out of her bed and collect all of the cell phones in the home, and she complied. After collecting the cell phones, D.R.-1 went to the living room, and the Petitioner "dared her to move." The Petitioner then went to A.R.'s room and D.R.-1 took the opportunity to run out of the house. Although the Petitioner followed D.R.-1 saying that he was going to "f'ing kill" her, he eventually gave up his chase.

D.R.-1 went to her father's home, which was located near her mother's home. Her father gave her his cell phone, and she hid in a closet and used that cell phone to call 911. D.R.-1 told 911 that her mother's boyfriend had broken into her house, held a gun to her head, and that she was not sure if her mother and brother were alive or dead.

While the Petitioner was outside chasing D.R.-1, A.R. woke up her son, D.R.-2, and told him to call 911. In addition to waking up her son, A.R. also locked her front door, but the Petitioner kicked in the door and reentered the house. Once he was back inside the home, the Petitioner told D.R.-2, who suffered from cerebral palsy, to get dressed because they were going to D.R.-2's father's house. The Petitioner pointed his gun at D.R.-2 and dragged A.R. through the house by her arm and hair. Once the Petitioner, A.R. and D.R.-2 made it to the front porch, the Petitioner pointed the gun between A.R. and D.R.-2 and threatened to kill them thirty or forty times.

2

Thereafter, the Petitioner, A.R., and D.R.-2 walked to D.R.-2's father's house, and at that time, D.R.-2 convinced the Petitioner to let him go so that he could gain entry into his father's house and get his father. When the police arrived minutes later, the Petitioner and A.R. were on the back porch, and the Petitioner had the gun pointed toward A.R.'s head. As one officer approached, the Petitioner used A.R. as a shield between himself and the officer. Another officer who was familiar with the Petitioner arrived later, and he began to speak to the Petitioner. That officer, Sergeant Rose, was unable to shoot the Petitioner because he was too far way and was holding A.R. too closely. However, the Petitioner eventually surrendered his gun to Sergeant Rose and was permitted to speak with A.R. for a few minutes before he was taken away by police.

What happened to A.R. and D.R.-2 that night was a nightmare that clearly meets the statutory definition of kidnapping, which provides, in pertinent part:

> (a) Any person who unlawfully takes custody of, conceals, confines or restrains another person against his or her will by means of force, threat of force, duress, fraud, deceit, inveiglement, misrepresentation or enticement with the intent:
> ***
> "(2) To transport another person with the intent to inflict bodily injury or to terrorize the victim or another person; or"

W. Va. Code § 61-2-14a (2017).

As I noted in our dissent in *State v. Woodrum*, No. 18-1043 (W. Va. May 29, 2020) I believe that a clear reading of the statute calls for a very different conclusion than

that reached by the majority.[2]  A plain reading of the statute demonstrates that, under subsection (a)(2) (emphasis added), a person may be found guilty of kidnapping in two possible ways:

(1) Unlawfully taking custody of, concealing, confining or **restraining** another person against his or her will be means of force, threat of force, duress, fraud, deceit, inveiglement, misrepresentation or enticement with the intent to transport another person with the intent to inflict bodily injury; or,

(2) Unlawfully taking custody of, concealing, confining or **restraining** another person against his or her will be means of force, threat of force, duress, fraud, deceit, inveiglement, misrepresentation or enticement with the intent to terrorize the victim or another person.

Here, the indictment tracked the second definition in subsection (a)(2) by alleging that:

> HARRY LEE SMITH, JR., committed the offense of "Kidnapping" by unlawfully and feloniously holding [A.R. and D.R.-2] at gun point against her will, with the intent to terrorize her, against the peace and dignity of the State.

The two kidnapping counts of the indictment (Counts I and 2) are not only consistent with the language of the 2017 statute, but also consistent with the long-

---

[2] The *Woodrum* case examined the 2014 version of our kidnapping statute.  Our kidnapping statute was amended in 2017, but the 2017 amendments did not change the subsection at issue in this case.

4

recognized, common-sense definition of kidnapping as has been reflected in our State's statutory and common law for decades.

West Virginia's kidnapping statute was first enacted in 1933 in reaction to the kidnapping of Charles Lindbergh's baby. Under that statute, which has been updated and modified at various times, transport was not necessary to find a person guilty of the crime of kidnapping. This Court recognized this fact when it held:

> From the formation of this State until 1933, we did not have a general kidnapping statute. We utilized two Virginia statutes which dealt with the abduction of a female and the kidnapping of a child. It was not until the kidnapping of Charles Lindbergh's child in 1932 that many states, including West Virginia, enacted broader kidnapping statutes with more severe penalties patterned in some degree after the federal kidnapping act, 18 U.S.C. § 1201. Generally, these statutes expanded the scope of kidnapping to include almost any forced movement **or detention** within the State.

*State v. Miller*, 175 W. Va. 616, 620, 336 S.E.2d 910, 914 (1985) (emphasis added).

As I pointed out in our dissent in *Woodrum*, in 2012, the Legislature amended our kidnapping statute by revising this section. *See* W. Va. Code § 61-2-14a (2012). This express language indicates that the Legislature used the Model Penal Code as a guide.[3] Section 212.1 of the Model Penal Code provides:

> A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, **or if he**

---

[3] "A majority of states derive at least one of their kidnapping statutes from the Model Penal Code section 212.1." Melanie A. Prince, *Two Crimes for the Price of One: The Problem with Kidnapping Statutes in Tennessee and Beyond*, 76 Tenn. L. Rev. 789, 806 (2009).

**unlawfully confines another for a substantial period in a place of isolation**, with any of the following purposes:

(a) to hold for ransom or reward, or as a shield or hostage; or

(b) to facilitate commission of any felony or flight thereafter; or

(c) to inflict bodily injury on or **to terrorize the victim or another**; or

(d) to interfere with the performance of any governmental or political function.

MODEL PENAL CODE § 212.1 (AM. LAW INST. 2018) (emphasis added). The notes from the Model Penal Code clearly indicate that kidnapping may involve removal or confinement but need not include both:

> Section 212.1 confines the most serious offenses to instances of substantial removal or confinement for a series of specified purposes, such as to hold for ransom or reward or to interfere with the performance of a governmental function. The **removal or confinement** must be accomplished by force, threat, or deception, or in the case of underage children or incompetents, without the consent of a parent or other appropriate person.

MODEL PENAL CODE § 212, Pt. II, Refs & Annos (AM. LAW INST. 2018) (emphasis added). Reviewing West Virginia Code § 61-2-14a(a)(2)(2017), it is clear that the Legislature simply adopted the language of the Model Penal Code and added "to transport another person" to the beginning and "person" to the end:

6

"(2) To transport another person with the intent to inflict bodily injury or to terrorize the victim or another person."

The addition of the phrase "to transport another person" at the beginning of the phrase clearly applies only to the subsequent phrase "with intent to inflict bodily injury."

Had the Legislature intended for "[t]o transport" to apply to both subsequent phrases within the subsection, it would have simply provided "with the intent to inflict bodily injury or terrorize the victim or another person," leaving out the word "to." The addition of the word "to" immediately prior to "terrorize" clearly establishes the phrase "to terrorize the victim or another person," as an independent phrase, not subject to the modifier "[t]o transport."

The majority's interpretation of the statute renders the word "to" in the phrase "to terrorize" entirely superfluous and meaningless. Unlawfully restraining another person with intent to terrorize the victim clearly constitutes kidnapping under W. Va. Code § 61-2-14(a)(2). Transport of the victim is not a necessary element of this crime and this fact is consistent with the traditional definition of kidnapping, the Model Penal Code, and the plain language of the statute.

The indictment was not defective, and the circuit court correctly concluded that transportation is not an essential element of the crime of kidnapping, as charged. Accordingly, I concur in the majority's holding insofar as it affirms Petitioner's convictions for one count of breaking and entering and three counts of wanton endangerment.

However, I respectfully dissent as to the majority's decision to vacate the Petitioner's convictions for kidnapping.

I am authorized to state that Justice Jenkins joins in this separate opinion concurring, in part, and dissenting, in part.

For these reasons, I respectfully dissent.